# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 22, 2013

No. 12-70028

Lyle W. Cayce
Clerk

TOMMY LYNN SELLS,

Petitioner-Appellant

v.

WILLIAM STEPHENS, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent-Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:08-CV-465

Before JOLLY, DAVIS, and PRADO, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[*]

Petitioner Tommy Lynn Sells ("Sells") appeals the district court's denial
of additional funding and seeks a certificate of appealability ("COA") to prosecute
his application for habeas corpus challenging the constitutionality of his Texas
state court death sentence. Sells was denied relief on direct appeal, in three state
habeas corpus proceedings, and finally by the district court, and we now

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 12-70028

AFFIRM the district court's denial of additional funding and DENY Sells's motion for a COA.

I.

A. The Crime

The facts underlying Sell's conviction are not in dispute. Early in the morning on December 30, 1999, Sells secretly entered the Del Rio, Texas trailer home of Terry Harris, an acquaintance of Sells. Sells was familiar with Harris's home, having previously visited Harris there. Armed with a butcher knife, Sells explored the residence. Although Harris was out of town, the residence was occupied by five people on that morning: In one bedroom was Harris's wife, asleep with a young girl; in another bedroom was a young boy; and in one of the bedrooms was a bunk bed occupied by Harris's thirteen-year-old daughter, Kaylene Harris and her family friend, eleven-year-old Krystal Surles. Seeing the girls asleep, Sells lay down next to Kaylene on the bottom bunk and cut off her underwear. When he began to grope Kaylene and touch her genitals, she snapped awake and yelled for Krystal to go get help.

Sells jumped up at the same time as Kaylene and situated himself between Kaylene and the bedroom door. When she attempted to open the door, Sells stabbed Kaylene with the knife he was still wielding. Sells then turned on the bedroom light and lunged at Kaylene again with the knife, stabbing her a total of sixteen times and slitting her throat multiple times; Kaylene died almost immediately. Sells then remembered Krystal still in the top bunk and hurriedly slit her throat before leaving the room. As he exited the trailer, he wiped his fingerprints off a doorknob and took with him two window screens he thought might contain his fingerprints. Sells then drove back to his house, stopping to discard the knife and window screens in a field.

No. 12-70028

Meanwhile, a wounded Krystal pretended to be dead until Sells left the home. Believing everyone in the Harris trailer to be dead, Krystal walked to a neighbor's house where she awoke the neighbors and indicated in writing that help was needed at the Harris residence. After receiving care for her injuries, Krystal was able to supply the police with a description of her assailant, from which a composite drawing was made. The attacker was promptly identified as Tommy Lynn Sells, who was located and arrested two days later.

Upon being arrested, Sells immediately confessed to the murder. In a videotaped statement of his confession, Sells indicated that he was glad to have been caught so that he would not hurt others, and briefly alluded to another young girl that he may have murdered in Kentucky. That same day, Sells voluntarily accompanied police to the Harris residence. There he led them through a videotaped narrative re-enactment of his crime, describing in detail how he murdered Kaylene Harris and attempted to murder Krystal Surles. Multiple forms of evidence corroborated Sells's confession and Krystal's uncontradicted testimony, including: the location of the murder weapon; the medical examiner's testimony regarding Kaylene's injuries; forensic tests confirming the presence of Sells's blood and clothing fibers on Kaylene; and forensic tests confirming the presence of Kaylene's blood and clothing fibers on Sells.

Sells was subsequently indicted for the murder of Kaylene Harris and the attempted murder of Krystal Surles. At his ensuing jury trial, Sells pled guilty to the attempted murder charge and presented no evidence regarding his guilt in Kaylene's murder. After deliberating less than two hours, the jury found Sells guilty of murder on September 18, 2000.[1]

---

[1] The trial and story of Sells has garnered a substantial amount of national media attention, due largely to Sells's claim to have committed as many as seventy murders in his lifetime.

No. 12-70028

B. Sentencing

At the punishment phase of Sells's trial, the state of Texas sought the death penalty. As evidence of Sells's incapacity for rehabilitation and continuing proclivity for violence, the state first offered the testimony of Danny Calderon ("Calderon"), a prison inmate who had been housed next to Sells for about two months. Calderon testified that during their incarceration together, Sells became angry with him and threatened to maim and kill him. In response to Sells's threats, jail officials had to relocate Calderon to a different part of the facility away from Sells.

The prosecution next called psychologist Dr. Frederick Gary Mears ("Dr. Mears"), who presented expert testimony based primarily on his review of Sells's records and the details of Kaylene Harris's murder. Dr. Mears testified that (1) Sells was "off the scale" in terms of the likelihood of future violence, (2) the past is the best predictor of an individual's future violent behavior, (3) Kaylene's autopsy revealed a number of postmortem wounds consistent with intentional body desecration and mutilation, (4) the nature of many of Kaylene's non-fatal wounds suggested Sells derived pleasure from the brutality of the murder, (5) Sells qualified as a highly manipulative, antisocial personality, (6) consistent with his antisocial personality, Sells displayed a cavalier attitude during his confessions and narrative re-enactment of the crime indicative of a lack of emotion and an absolute indifference to death, (7) Sells's criminal history demonstrated an escalation in violence over time, and (8) Sells displayed no remorse for the murder of Kaylene and attempted murder of Krystal.

The final witness offered by the prosecution was a state fingerprint analyst, who testified that Sells's fingerprints positively verified his out-of-state criminal record. Those records indicated that Sells had been convicted of automobile theft in Wyoming in 1990 and malicious wounding in West Virginia in 1993.

No. 12-70028

In response, the defense called a jail administrator who testified that Sells had only two disciplinary referrals during his eight-month stay in the Texas jail. The defense then called its own psychologist, Dr. Windel Lee Dickerson ("Dr. Dickerson"). Dr. Dickerson testified that he had interviewed Sells at length, listened to an interview with Sells's mother, reviewed Sells's prison records, and spoken with multiple people who had known Sells throughout his life. Based on his investigation, Dr. Dickerson testified that (1) he suspected Sells had been sexually abused as a child by a local pedophile, but that Sells would not discuss the subject, (2) Sells had a profound history of substance abuse that began as early as age seven, (3) a brain-activity scan revealed a widespread pattern of "diffuse abnormality" in Sells's brain functions, (4) psychological testing confirmed that Sells was a very seriously disordered individual, and (5) rather than having a true antisocial personality, Sells had a borderline personality disorder with schizoid, avoidant, and antisocial features and possible brain damage. Moreover, Dr. Dickerson opined that it was not possible to reliably predict Sells's propensity for future violence. Dr. Dickerson summarized his testimony as follows:

> What my examination has revealed to this point is, there is a history of life experience which could be— which could be considered instigators to violence, things that prompt him. There are conditions that are present in his mind and body which I think dramatically affect his ability to guide and direct his own behavior and resist those instigations [sic] to violence. Those same things that reduce his capacity for self-restraint have also altered his ability— I think his ability to get a wrap around a lot of bad things that has [sic] happened in his life and reconstruct them, reposition them in his life in such a way that they do not cause him the problems that they have caused, so I think when I talk about Tommy Lynn Sells, I'm talking about somebody who has got a lot of problems that give us cause to be very seriously concerned.

No. 12-70028

Dr. Dickerson testified further that medications had helped control Sells's propensity for violence during previous incarcerations. In his opinion, the Texas prison system could isolate and manage Sells to such a degree that he did not pose a threat to other prisoners. For example, Dr. Dickerson observed that many of the normal prompters of violence are not present in prison, such as weapons, street drugs, alcohol, personal stress, and financial responsibilities. With proper supervision, medication, and mental illness treatment, Dr. Dickerson testified that prison would greatly limit Sells's ability to place others in danger, especially as he aged.

Upon cross-examination, Dr. Dickerson conceded that testing of Sells revealed an extreme lack of empathy, and that such individuals are ordinarily very angry, irritable, unable to express their feelings, and have a low tolerance for personal frustration. Dr. Dickerson further confirmed that although Sells was paranoid and exhibited a host of psychological problems, medical testing revealed no brain tumors or physical seizure disorders. Moreover, he admitted that Sells's crime was very opportunistic. Dr. Dickerson claimed not to remember a videotaped statement wherein Sells stated that he was glad he had been caught because he feared hurting other people. Dr. Dickerson also admitted that inmates are free to refuse medication and interfere with their treatment, often do obtain weapons, and can always potentially escape.

In response to the defense's evidence, the prosecution summoned one rebuttal witness, Royce Smithey ("Smithey"), the chief investigator for the Texas Special Prison Prosecution Unit. Smithey testified that prison and prisoner segregation can reduce but do not eliminate the risk of violence. Moreover, "administrative segregation" of a prisoner is merely a prisoner classification, not a type of separate facility. Thus, even segregated prisoners ordinarily have contact with other prisoners and guards. Nonetheless, Smithey conceded that it is a small fraction of prisoners who account for most of the violence in the prison

6

No. 12-70028

system. In response, the defense attempted to present a videotape documenting one of the administrative segregation facilities used by the Texas prison system. The defense claimed that the tape demonstrated that Sells could be effectively isolated to prevent harm to others, but the trial court excluded the evidence as duplicative and irrelevant.

After hearing the testimony, the jury returned a verdict supporting the death penalty for Sells. Specifically, the jury found beyond a reasonable doubt that there was a probability that (1) Sells would commit criminal acts of violence that constituted a continuing threat to society, and (2) taking into consideration all of the evidence, including the circumstances of the offense, and the petitioner's character, background, and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment.

C. Post-Conviction Proceedings

Sells immediately appealed his conviction to the Texas Court of Criminal Appeals ("TCCA"), which affirmed both his conviction and his sentence. *See Sells v. State*, 121 S.W.3d 748 (Tex. Crim. App.), *cert. denied*, 540 U.S. 986 (2003). Among the specific objections addressed by the court and rejected on direct appeal was the trial court's exclusion of the administrative segregation videotape.

Sells subsequently applied for a state writ of habeas corpus, relying solely on a claim of ineffective assistance of trial counsel ("IATC"). Specifically, Sells alleged that his trial counsel was ineffective because the attorney failed to investigate and present unspecified mitigating evidence and called too few witnesses at the trial's punishment phase. In support of his IATC claim, Sells offered two exhibits: (1) an affidavit by his state habeas investigator, Ann Matthews, in which she opined that Sells's trial counsel was pursuing book rights, fame, and unrelated murder confessions more aggressively than he was

pursuing Sells's defense, and (2) an affidavit by an individual named Bob Schanz alleging that Sells intended to confess to another murder in Missouri.

In response to Sells's IATC evidence, the state presented an affidavit by Sells's trial counsel, which alleged: (1) the defense team's court-appointed investigator had in fact spoken with "various family members of Tommy Lynn Sells and did not find any helpful mitigation evidence that was not already known," (2) at the defense team's behest, Sells had undergone a brain PET scan which revealed no potentially-mitigating signs of brain damage or schizophrenia, (3) there had never been any discussion of book royalties or publication rights, (4) the defense team made a strategic decision not to call any mitigation witnesses besides Dr. Dickerson because of concerns that they might have knowledge of extraneous offenses committed by Sells which could have been raised and used by the prosecution, and (5) Sells endorsed this strategic decision.

In June 2005, the state habeas trial court issued an order and recommended that Sells's habeas corpus petition be denied. The TCCA adopted the findings and recommendation of the trial court, and Sells's habeas corpus petition was denied. *See Ex parte Tommy Lynn Sells*, WR-62, 552-01 (Tex. Crim. App. 2005).

Sells then filed his federal habeas corpus petition in federal district court in August 2006. However, the petition was immediately stayed so that Sells could file a second *state* habeas corpus application, arguing this time that he was mentally retarded and exempt from execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). The TCCA denied investigative funding and dismissed the petition, finding that Sells had failed to make a threshold showing of evidence to support a finding that he is mentally retarded. *See Ex parte Tommy Lynn Sells*, WR-62, 552-02, 2007 WL 1493151 (Tex. Crim. App. 2007). Sells then returned to federal court, which granted him funding to investigate and prepare his *Atkins* claim.

After attempting to develop an *Atkins* claim, Sells's defense counsel decided it was not worth pursuing. However, his defense counsel alleged that during the investigation, new evidence emerged relating to Sells's chronic childhood sexual abuse and a possible fetal alcohol syndrome disability. According to Sells, this was mitigating evidence that could have justified a sentence other than death, and which Sells's trial counsel should have uncovered. Sells thus requested another stay in federal court to permit him to return to Texas state court and exhaust his IATC claim.

In September 2010, Sells filed a third state habeas corpus application, asserting several new IATC claims. In this petition, Sells alleged deficient assistance of counsel arising out of, among other things: (1) trial counsel's failure to seek a continuance to investigate potential mitigating evidence in Missouri, (2) trial counsel's failure to subpoena out-of-state witnesses to testify as to Sells's childhood, (3) trial counsel's failure to develop and present evidence that Sells suffered from fetal alcohol syndrome, (4) trial counsel's failure to obtain Sells's mental health records and seek a mental health evaluation of Sells, (5) trial counsel's failure to ask defense expert Dr. Dickerson questions that might have "personalized" Sells, (6) trial counsel's failure to obtain adequate expert and investigative funding from the trial court, and (7) first habeas corpus counsel's failure to present all of these claims. In support of his petition, Sells attached a host of documentary evidence, including affidavits, sworn statements, and authenticated documents relating to Sells's mental capacity, background, substance abuse, childhood, and other potentially mitigating factors. Despite the addition of new evidence, the TCCA dismissed Sells's petition pursuant to the Texas writ abuse statute. *See* TEX. CODE CRIM. PROC. art. 11.071 § 5.

In December 2010, the federal district court lifted the stay on Sells's petition and directed him to file an amended habeas petition setting forth all of his exhausted claims for relief. Sells immediately filed motions for additional

time and funding to develop the claims from his third state habeas petition, which the district court denied. In February 2011, Sells finally filed the instant amended habeas corpus petition in which he again alleged IATC arising out of the same issues he raised in his third state habeas petition. This time, however, Sells attached thirty-four exhibits to support his IATC claims. In addition, Sells argued that the exclusion of the administrative segregation videotape violated his Eighth and Fourteenth Amendment rights.

Responding to Sells's multiple claims that his trial counsel failed to adequately investigate and present mitigating evidence during the trial's punishment phase, the district court found that Sells's primary support for these claims was a "plethora of documents" that he had never presented to any state court. Specifically, Sells's new evidence included extensive Missouri penal system records and criminal records reflecting Sells's behavioral problems as a youth, similar records from West Virginia documenting a sexual assault committed by Sells and diagnosis of antisocial behavior, and several expert reports concerning fetal alcohol syndrome spectrum disorders. The district court found that Sells's new "voluminous documents substantially alter the context and content of the ineffective assistance claims" Sells had presented to the state habeas courts. As such, Sells had not fairly presented his claims to the state court, and they were therefore unexhausted and not subject to federal habeas review.

Moreover, the district court found that to the extent any of Sells's IATC claims did not depend on new evidence, they were still unexhausted by virtue of the third state habeas court's refusal to consider them. Because the Texas state court dismissed Sells's third state habeas petition for abuse of the writ, his corresponding habeas claims were unaddressed and procedurally barred under Texas law, and therefore incapable of exhaustion. Accordingly, Sells's IATC claims were not subject to federal habeas review. Regardless, the district court

alternatively found that each of Sells's IATC claims failed on the merits anyway. Reviewing each of Sells's IATC claims, the district court concluded that none of the alleged errors either demonstrated a constitutionally deficient level of representation or had caused actual prejudice to Sells. Finally, the district court also rejected Sells's argument that his constitutional rights had been violated by the trial court's exclusion of the administrative segregation videotape.[2]

## II.

Before a federal habeas petitioner can appeal the district court's denial of his petition, he must first obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." *See id.* § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, when the district court denies a habeas petition on procedural grounds, a COA should only issue if "the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* (emphasis added).

No COA is necessary to appeal the district court's denial of funds to a habeas petitioner, and we review that portion of the district court's order for abuse of discretion. *See Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005).

---

[2] Although not challenged in this petition for a COA, the district court also rejected each of the other errors alleged by Sells in his federal habeas petition.

No. 12-70028

## III.

Sells now challenges the district court's denial of habeas relief, and seeks a certificate of appealability with respect to two issues: (1) whether Sells's trial counsel provided ineffective assistance at the sentencing phase of his trial, and (2) whether the exclusion of the administrative segregation videotape violated Sells's Eighth and Fourteenth Amendment rights. In addition, Sells argues that the district court improperly denied him sufficient funding to develop mitigating evidence that would have supported a sentence less than death.

### A.

Sells first contends that the district court erred in its determination that his IATC claim was unexhausted and not subject to federal review. Alternatively, Sells contends that if his claim is unexhausted, it may still be entertained because he has established cause and prejudice for his procedural default.

### 1.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") precludes a federal court from granting a state prisoner's application for a writ of habeas corpus unless "the applicant has exhausted the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(1)(A). This "exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court."[3] Under this standard, the mere addition of new evidence is not itself enough to render a habeas petitioner's claim unexhausted: "[D]ismissal is not required when evidence presented for the first time in a habeas proceeding *supplements*, but does not *fundamentally alter*, the claim presented to the state

---

[3] *Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005) (quoting *Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999)), *abrogated in part as stated in Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012).

12

No. 12-70028

courts."[4] Moreover, the fact that new evidence places a habeas petitioner's claim in a comparatively stronger evidentiary posture than it was in state court is not dispositive. *Morris*, 413 F.3d at 496. However, evidence that places the claims in a "significantly different legal posture" must first be presented to the state courts. *See id.* at 491.[5]

The determination of whether additional evidence fundamentally alters or merely supplements the state petition is necessarily case and fact specific. *Id.* However, our decision in *Anderson v. Johnson* illustrates the type of facts which support a finding that new evidence is merely supplemental. 338 F.3d 382. In *Anderson*, the highest state court denied Anderson's petition without holding an evidentiary hearing. *Id.* at 388–89. In his ensuing federal petition, he presented additional evidence in the form of an affidavit from a key eyewitness not called at his trial. *Id.* Though the evidence had not been considered by the state court, we noted that his state post-conviction brief was "remarkably detailed in both fact and law" and contained specific references to the testimony that was later offered in a federal affidavit. *Id.* We therefore determined that the affidavit did not "fundamentally alter" his ineffective assistance of counsel claim and therefore held that Anderson had properly exhausted state remedies. *Id.*[6]

---

[4] *Morris*, 413 F.3d at 491 (emphasis in original) (quoting *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003)).

[5] *See also Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003) ("A habeas petitioner fails to exhaust state remedies 'when he presents material additional evidentiary support to the federal court that was not presented to the state court.'" (quoting *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir.1996))).

[6] *See also Dowthitt v. Johnson*, where we considered whether Dowthitt had exhausted his IATC claims arising out of his counsel's failure to present sufficient mitigating evidence of his alleged mental illness. 230 F.3d 733, 746 (5th Cir. 2000)*, abrogated in part as stated in Lewis v. Thaler*, 701 F.3d 783, 790 (5th Cir. 2012). We found the exhaustion requirement satisfied because Dowthitt had presented detailed assertions of his paranoid schizophrenia to the state courts, even though he later offered additional affidavits by mental health experts opining on that same diagnosis to the federal court. *Id.*

No. 12-70028

In other cases, however, we have consistently refused to consider a habeas petitioner's claims exhausted where the petitioner provides substantial amounts of new evidence, the claims and allegations before the state court were conclusory and undeveloped, the petitioner offers new evidence that could not have been derived from the state court record, and the petitioner offers new evidence which alters the nature of his claims. For example, in *Ibarra v. Thaler*, we considered whether to grant a COA with regard to habeas petitioner Ibarra's claim of mental retardation. 691 F.3d 677, 681–82 (5th Cir. 2012). However, the only evidence Ibarra presented to the state court was the affidavit of his investigator, which detailed facts she had discovered regarding Ibarra's alleged early adaptive deficits. *Id*. at 682. When Ibarra filed his federal habeas petition, he attempted to introduce new evidence, including an authenticated expert report and affidavits from his family and childhood teacher, none of which was a part of the state court record. *Id*. We concluded that the quantity and quality of Ibarra's new evidence fundamentally altered Ibarra's claim of mental retardation and rendered his claim unexhausted. *See id*.[7]

In the instant case, Sells's IATC claims fit into the class of cases in which new evidence renders a petitioner's claims unexhausted. When Sells filed his habeas petition alleging the ineffective assistance of his trial counsel, he argued that his attorney failed to investigate and present mitigating evidence about Sells's background. However, in support of this IATC claim, Sells focused on allegations that his trial team had a conflict of interest arising out of their

---

[7] *See also Kunkle v. Dretke*, 352 F.3d 980, 987 (5th Cir. 2003) (finding that habeas claim was unexhausted when a detailed affidavit and expert report were used to "supplement" a conclusory affidavit); *Brown v. Estelle*, 701 F.2d 494, 495–96 (5th Cir. 1983) (finding petitioner's claim unexhausted where he presented new affidavits which "added some substantiation to contentions which previously had no serious corroboration"); *Demarest v. Price*, 130 F.3d 922, 938–39 (10th Cir. 1997) (finding IATC claim not exhausted where petitioner's new evidence transformed his ineffective assistance of counsel claim into one that was "significantly different and more substantial").

14

pursuit of book and publicity rights. No new evidence was offered concerning childhood abuse or fetal alcohol syndrome. However, Sells now asks us to consider a bounty of evidence which no state court has yet had the opportunity to evaluate, including: written statements by Sells's mother, brother, childhood family friend, schoolmate, and others; hospital records; Missouri prison system records; a 1990 mental health evaluation; and the affidavits of at least two mental health experts. We agree with the district court that this substantial quantity of new evidence never considered by a state court fundamentally alters Sells's IATC claims and renders them unexhausted. Based on our caselaw, reasonable jurists could not reach a different conclusion.

2.

This determination does not end our inquiry, however. Sells argues that he attempted to present the substance of his instant IATC claims in his third state habeas petition, but the state court refused to consider his petition as an abuse of the writ. With his claims dismissed and procedurally defaulted under Texas law, Sells is effectively precluded from exhausting his IATC claims in state court. Nonetheless, in such cases, we may still consider a petitioner's unexhausted claims if he can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law."[8]

The only cause for default which Sells alleges is the ineffective assistance of his *habeas* counsel in failing to properly develop and investigate the ineffective assistance of his *trial* counsel. Had Sells's habeas counsel reasonably investigated the deficiency of the trial counsel, then the new evidence which renders Sells's IATC claim unexhausted could have been presented to and considered by the state court in the first state habeas proceeding. Although this argument is only available under certain states' procedural regimes, it is now

---

[8] *Johnson v. Cain*, 712 F.3d 227, 234 (5th Cir. 2013) (quoting *Woodfox v. Cain*, 609 F.3d 774, 793 (5th Cir. 2010)).

No. 12-70028

undisputed that deficient counsel in an initial Texas state habeas proceeding can constitute cause for default.[9] However, to establish cause, Sells must first establish the deficiency of his habeas counsel.

Where a habeas petitioner alleges prejudice arising from the deficiency of his habeas counsel in failing to properly assert the deficiency of his trial counsel, he must demonstrate the constitutional inadequacy of both attorneys to be entitled to relief. *See Martinez*, 132 S. Ct. at 1318.[10] Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice.

Ineffective assistance of counsel claims are governed by the standard laid out in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.[11]

In order to satisfy the performance prong, Sells must show that both his trial and habeas counsels' representation fell below an "objective standard of reasonableness." *See Strickland*, 466 U.S. at 688. Under the second prong, Sells must show that there is "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and

---

[9] *See Trevino v. Thaler*, 133 S. Ct. ____, slip op. at 13–15 (2013).

[10] To be clear, in cases like this, a prisoner must demonstrate the ineffective assistance of his habeas counsel. However, "a prisoner must [only] demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318.

[11] *Roberts v. Thaler*, 681 F.3d 597, 610 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. 668, 687 (1984)).

mitigating circumstances did not warrant death." *Id.* at 695. This showing is intentionally difficult to satisfy: "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome . . . . Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington v. Richter*, 131 S. Ct. 770, 791–92 (2011).

We begin by examining whether Sells can carry his burden of establishing the constitutional inadequacy of his first habeas counsel, Terry McDonald ("McDonald"). Sells argues that McDonald's representation was deficient because McDonald failed to diligently investigate and offer proof of the trial attorney's failure to develop and present mitigating evidence at sentencing.[12] As proof of McDonald's incompetence, Sells points to the fact that the habeas petition filed by McDonald was "only 22 pages," only raised four claims, and was supported by only two exhibits. Moreover, Sells argues that McDonald "virtually abdicated his role" by delegating the mitigating evidence investigation to an investigator; and the investigator's efforts were inadequate because she primarily relied on phone calls to contact potential witnesses.

Sells fails to offer anything but conclusory assertions to show that McDonald's representation was objectively unreasonable. *See Strickland*, 466 U.S. at 688. Sells's reliance upon the length of his habeas petition or the number of claims it raises in no way establishes the unreasonableness of McDonald's actions. The fact that McDonald delegated the investigation of additional mitigating facts to an experienced mitigation specialist is not troublesome at all.

---

[12] Based on Sells's federal habeas petition, the alleged shortcomings of trial counsel's mitigation investigation consist of counsel's failure to: seek a continuance to investigate potential mitigating evidence in Missouri, subpoena out-of-state witnesses to testify about Sells's childhood, offer mitigating psychological evidence, obtain Sells's mental health records and seek a mental health evaluation, and ask defense expert Dr. Dickerson questions that might have "personalized" Sells.

No. 12-70028

Nor have we been offered any reason why an investigator's use of a telephone to speak with potential witnesses should be considered a sign of constitutional deficiency. To the contrary, the evidence demonstrates McDonald's personal efforts to locate mitigating evidence; McDonald's affidavit indicates that he reviewed at length the files of both the defense and the prosecution, but found nothing useful. We also take note of the affidavit of Sells's trial counsel in which he states that the decision not to call further mitigation witnesses was strategically designed to keep the prosecution from eliciting information about Sells's numerous extraneous offenses. Such a strategic decision is entitled to the greatest degree of deference and challenging it would almost certainly have been futile.[13] Accordingly, Sells has not demonstrated that McDonald's representation fell below acceptable standards.

Even if Sells could demonstrate the objective unreasonableness of McDonald's mitigation investigation efforts, he cannot demonstrate that he suffered actual prejudice. Sells points to the mass of affidavits and reports he has since mustered as the mitigating evidence which a reasonable investigation should have uncovered. However, much of this evidence is of a type that would not have shed any real mitigating light on Sells's background.[14] Other items of

---

[13] "[A] 'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" *Virgil v. Dretke*, 446 F.3d 598, 608 (5th Cir. 2006) (quoting *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004)).

[14] For example: (1) ECF-103(2), the affidavit of Sells's brother, Timmy Sells (stating that Tommy got picked on as a kid, was not very intelligent, and could not be trusted with many tasks); (2) ECF-103(3), the unsworn declaration of Sells's brother, Timmy Sells (stating that though Tommy worked as a mechanic, he was not capable of doing any complex work); (3) ECF-103(7), the affidavit of Sells's prison acquaintance, Danny Hunter (stating that Tommy was slow, but he still earned his GED in prison); (4) ECF-103(10), neuropsychological evaluation by Dr. Antoinette McGarrahan (positing that Sells was of below average intelligence, abused drugs and alcohol, had antisocial personality disorder, and had borderline personality traits).

No. 12-70028

evidence that Sells contends should have been discovered were duplicative,[15] irrelevant,[16] or even damaging.[17] As the district court noted, the only new allegations contained in the "mitigating evidence" offered by Sells are an isolated statement that Sells may have been molested by his mother and grandmother, and bald conjecture that Sells could have a fetal alcohol syndrome disability.

As to Sells's uncorroborated assertions that he had been molested by his mother and grandmother, that is not the type of evidence that would reasonably have been discovered by even the most thorough investigation by McDonald. Knowledge about this alleged abuse was apparently limited to the parties involved, yet Sells's mother and grandmother have never confessed to it, and Sells himself withheld the information from McDonald.

Equally unconvincing is Sells's assertion that evidence of a fetal alcohol disability would likely have mitigated his sentence. Specifically, Sells argues that his mother's new admission that she drank occasionally[18] while pregnant with Sells, if properly utilized, "could have led to a diagnosis of Fetal Alcohol Spectrum Disorder." While Sells argues that the blameless nature of fetal

---

[15] For example: (1) ECF-103(4), the affidavit of Sells's mother, Nina Lovins (stating that Sells was a very slow learner and a discipline problem and that he had been sexually abused by a local man); (2) ECF-82(3), the declaration of Sells's childhood friend, Paul Hunt (stating that Sells was slow).

[16] For example: (1) ECF-103(6), the Social Security Administration employment record of Tommy Sells (summarizing earnings from January 1979–December 2000); (2) ECF-103(9), the declaration of Sells's step-son, Jonathan Levrie (stating that Sells worked at a local car dealership and was not around much).

[17] For example: (1) ECF-103(5), Missouri Department of Corrections psychiatric evaluation (indicating that Tommy was of normal intelligence but potentially had a personality disorder); (2) ECF-103(8), declaration of Sells's ex-wife, Jessica Levrie Blanco Sells (stating that Tommy could take care of himself, and that her daughter claimed to have been molested by Sells); (3) West Virginia prison records (documenting the sexual assault accusations against Sells by the victim of his malicious wounding crime).

[18] The only testimony concerning Sells's mother's drinking was her admission that she sometimes "drank screwdrivers on Friday nights" and "probably" drank other times.

19

alcohol impairment could have had a "powerful mitigating effect," he ignores the fact that the trial evidence already established that Sells suffered from serious personality and adaptive impairments for which he bore no blame. In fact, the trial court heard testimony from both sides concerning Sells's psychological evaluations and dysfunctionality, and so it is doubtful that Sells would have derived any mitigating benefit merely by linking that diagnosis to fetal alcohol syndrome. Moreover, we have previously found that evidence of fetal alcohol syndrome-related deficiencies is not necessarily beneficial to a criminal defendant. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) ("The [fetal alcohol disability] evidence that [petitioner] claims his counsel should have presented is 'double-edged' because, although it might permit an inference that he is not as morally culpable for his behavior, it also might suggest that he, as a product of his environment, is likely to continue to be dangerous in the future.").[19]

Considering the lack of mitigating evidence against the substantial evidence in aggravation, we find that Sells has not demonstrated that his new evidence would likely have resulted in a sentence less than death. *See Williams v. Taylor*, 529 U.S. 362, 397–98 (2000). Because Sells cannot establish the inadequacy of his habeas counsel or actual prejudice to his sentence, he cannot establish cause for the default of his IATC claims. Accordingly, reasonable jurists would agree that Sells has failed to establish cause for his procedural default.

---

[19] The *Brown* court reached that conclusion amid much more significant evidence of fetal alcohol syndrome; the evidence showed that the petitioner's mother drank on a "daily, or near daily basis; that she drank heavily throughout her pregnancy with Brown [and] that [she] was likely an alcoholic." 684 F.3d at 494.

No. 12-70028

B.

Sells next argues that the state court's exclusion of the administrative segregation videotape violated his Eighth and Fourteenth Amendment rights.

At trial, Sells had attempted to present the videotape as evidence that the Texas prison system could successfully isolate Sells from other prisoners such that he would not pose a continuing threat. The videotape purported to show the physical facilities of an administrative segregation unit, and portrayed the prison perimeter, inmate cells, day areas, recreation areas, medical facilities, inmate transport, shackling, inmate strip searches, and inmate feeding. The prosecution objected to the videotape as irrelevant and cumulative of the testimony already offered about prison facilities. Despite the defense's offer to shorten the videotape, the court excluded the tape on the ground that it did not portray the entirety of Texas prison operations. To the extent that it was relevant, the trial court found that it was cumulative of defense testimony and any relevance was also outweighed by the danger of misleading the jury as to aspects of the prison system that might not necessarily apply to Sells. Sells re-urged the error of excluding the videotape in a motion for new trial, again without success. The TCCA affirmed the trial court's decision on appeal.

AEDPA provides that habeas relief may not be granted to a state prisoner unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Relying on these provisions, Sells makes three distinct arguments based on the Texas court's exclusion of the videotape: the state court's decision (1) was based on an unreasonable determination of the facts, (2) involved an unreasonable application of Fourteenth Amendment due process precedent, and

21

No. 12-70028

(3) involved an unreasonable application of Eighth Amendment cruel and unusual punishment precedent.

1.

Sells's first argument that the exclusion of the videotape was improper is that it was based on an "unreasonable determination of the facts in light of the evidence." *See* 28 U.S.C. § 2254(d)(2). Under this standard, "It is not enough to show that a state court's decision was incorrect or erroneous. Rather, a petitioner must show that the decision was objectively unreasonable, a substantially higher threshold requiring the petitioner to show that a reasonable factfinder must conclude that the state court's determination of the facts was unreasonable."[20] Additionally, under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct," and that presumption must be rebutted "by clear and convincing evidence." These intersecting standards allow us to grant habeas relief based on a fact issue only if the petitioner demonstrates both an incorrect factual determination by clear and convincing evidence *and* that it compromised the objective reasonableness of the court's corresponding decision. *See Valdez v. Cockrell*, 274 F.3d 941, 951 n.17 (5th Cir. 2001).

The only factual determination challenged by Sells is the TCCA's affirmance of the finding that the prison videotape is irrelevant and potentially prejudicial. Sells contends that the videotape is directly relevant because it shows the types of precautionary measures available within the Texas prison system to preempt weapons and violence and to control inmate movements and behavior. However, Sells's contentions do little to address the reasoning of the TCCA:

---

[20] *Batchelor v. Cain*, 682 F.3d 400, 405 (5th Cir. 2012) (quoting *Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir.2011) (brackets and internal quotation marks omitted)).

No. 12-70028

> The videotape was not offered as information about the individual defendant or about how the individual defendant might be handled. Rather, as the judge noted, it portrayed only one aspect of an entire system and offered only general information about some procedures used in that system. That others have been controlled in the prison system or that certain procedures are in place without specifically connecting those procedures to appellant was not evidence of consequence to the jury's factual determination of whether appellant would pose a continuing threat to society.

*Sells*, 121 S.W.3d at 766. Where we are concerned with the potential danger posed by a particular prisoner in a particular setting, evidence of prison features that may or may not be applicable to the prisoner in question is not relevant. *See Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (stating that relevance standard applicable to mitigating evidence in capital cases is a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable"). In any case, the TCCA could certainly have concluded that any relevance was outweighed by the misleading generalizations implicit in the tape. Accordingly, reasonable jurists would agree that the state court's determination of the facts was not unreasonable.

2.

Sells's second argument that the exclusion of the videotape was improper is that it "involved an unreasonable application of clearly established" constitutional due process precedent. *See* 28 U.S.C. § 2254(d)(1). "Under § 2254(d)(1)'s 'unreasonable application' language, a writ may issue 'if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"[21]

Here Sells contends that the TCCA misapplied Supreme Court precedent interpreting the due process rights of criminal defendants. Specifically, Sells

---

[21] *Tucker v. Johnson*, 242 F.3d 617, 621 n.5 (5th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

argues that the state court's exclusion of relevant evidence deprived him of valuable evidence essential to the fairness of his trial. As the Supreme Court has emphasized, under a due process challenge, the relevant question is whether the trial court's error has "so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process."[22] Moreover, the due process inquiry considers the significance of the challenged evidence in the context of the entire trial. *Gonzales v. Thaler*, 643 F.3d 425, 430–31 (5th Cir. 2011). "We have held that the Due Process Clause does not afford relief where the challenged evidence was not the principal focus at trial and the errors were not so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. at 431.[23]

It is readily apparent from the lengthy record that the videotape was not the focus of Sells's sentencing hearing. Furthermore, having already concluded that the state court's decision to exclude the evidence as irrelevant was not improper, it necessarily follows that the decision did not "infect[] the trial with unfairness."[24] Because the videotape evidence had little to do with whether Sells individually posed a continuing threat to others (and therefore qualified for the death penalty in Texas), reasonable jurists would agree that it was not patently unfair to exclude it from his trial.[25]

---

[22] *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

[23] (footnote omitted) (internal quotation marks omitted).

[24] That the videotape evidence was not relevant to Sells's defense or sentence distinguishes it from the cases he cites in passing, in which the defendant was not permitted to offer evidence probative of an issue in dispute. *See, e.g.*, *Sears v. Upton*, 130 S.Ct. 3259, 3263 n.6 (2010); *Crane v. Kentucky*, 476 U.S. 683, 690–91 (1986); *Gardner v. Florida*, 430 U.S. 349, 362 (1977).

[25] Because we reach this conclusion without taking into account the district court's discussion of Texas prison system procedures, we need not address Sells's argument that such discussion constituted improper use of judicial notice.

No. 12-70028

3.

Sells's third argument that the exclusion of the videotape was improper is that it "involved an unreasonable application of clearly established" Eighth Amendment "cruel and unusual punishment" precedent. *See* 28 U.S.C. § 2254(d)(1); U.S. CONST. amend. VIII. In the context of mitigating evidence in a capital sentencing proceeding, the Supreme Court has clearly stated that the Eighth Amendment only requires the admission of *relevant* evidence. *See Tennard*, 542 U.S. at 284–85. Relevant mitigating evidence is "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id*. at 284.[26] It is only once this requirement of relevance is met that the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence. *Id*. at 285.[27]

Again, because we have already determined that the videotape depicting in a general way the Texas prison system in no way purports to document the specific restrictions to which Sells would have been subject, it is not relevant to the question of his future dangerousness. Because it is not relevant to mitigating Sells's sentence, the Eighth Amendment is not implicated.[28] *Id*. Moreover, as the Supreme Court has held, as long as any mitigating evidence is within "the effective reach of the sentencer," states are free to guide the sentencer's consideration of mitigating evidence." *Johnson v. Texas*, 509 U.S. 350, 362 (1993) (internal quotation marks omitted). While the state court may have regulated

---

[26] (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)).

[27] (quoting *Boyde v. California*, 494 U.S. 370, 377–78 (1990)).

[28] We assume for purposes of this opinion that evidence relating to future dangerousness in Texas, where such a finding is necessary to impose a death sentence, is "mitigating evidence." As the district court suggested, such evidence is arguably not mitigating because it does not reflect on the defendant's blameworthiness, culpability, character, prior record, or the circumstances of the offense.

No. 12-70028

the admission of the videotape due to its irrelevant and misleading nature, the allegedly mitigating evidence in the video had already been presented to the jury in the form of expert testimony on the ability of the Texas prison system to control and contain prisoners like Sells. We therefore find that reasonable jurists would agree that the TCCA's exclusion of the videotape did not deprive Sells of his Eighth Amendment rights.

C.

Sells lastly argues that the district court abused its discretion in denying him funding to develop mitigating evidence that might have supported a sentence less than death. Significantly, the district court's denial of additional funding came after the district court had already provided Sells five years and $25,000 to investigate and develop his habeas claims. Despite the resources already granted to Sells, he requested an additional $60,650 and now claims that he was unable to prevail on the merits because his IATC claims remain undeveloped.

Under the relevant statute, a district court "may authorize [and] order the payment of fees and expenses" for investigative, expert, or other services upon a finding that they "are reasonably necessary for the representation of the defendant." 18 U.S.C. § 3599(f). This court construes "reasonably necessary" to mean that a petitioner must demonstrate "a substantial need" for the requested assistance. *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004). However, "A petitioner cannot show a substantial need when his claim is procedurally barred from review." *Id.* In the instant case, we have already determined that Sells is procedurally barred from raising his IATC claims in federal court because they are unexhausted and he cannot demonstrate cause and prejudice. Moreover, Sells's claims were already procedurally barred at the time the district court denied his motion. In cases like this, our precedent is clear that a habeas

26

No. 12-70028

petitioner is not entitled to investigative funds, and the district court did not abuse its discretion in so holding.

## IV.

For the reasons stated above, the district court's judgment denying additional funding is AFFIRMED and Sells's motion for a COA is DENIED.